UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| FAMILY WATCHDOG, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:08-CV-642-SEB-DML |
| vs. | ) | |
| | ) | |
| LESTER SCHWEISS, SAHRA | ) | |
| SCHWEISS, INNOVATES, INC., KEY- | ) | |
| SYSTEMS GMBH d/b/a | ) | |
| DOMAINDISCOUNT24.COM, THE | ) | |
| NATIONAL ALERT REGISTRY, INC., | ) | |
| and CYBERSPACE TO PARADISE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ADDRESSING PENDING MOTIONS**

This matter is before the Court on Plaintiff, Family Watchdog, LLC's

("Watchdog"), Motion for Preliminary Injunction [Docket No. 50], filed on November 3,

2008;[1] the Second Motion to Dismiss [Docket No. 63], filed jointly by Defendants, Lester

and Sahra Schweiss and Innovates, Inc., on November 21, 2008;[2] the Motion to Dismiss

---

[1]This motion was advanced as part of Plaintiff's amended complaint, which explicitly
renews Plaintiff's Motion for Preliminary Injunction [Docket No. 10], filed on May 19, 2008.
Plaintiff's first amended complaint does not substantially differ from its original complaint.
Having incorporated the May 19 motion into the renewed motion, the initial motion is now moot.
Thus, Plaintiff's May 19, 2008, Motion for Preliminary Injunction [Docket No. 10] is <u>DENIED</u>
as moot.

[2]This motion reasserts the Motion to Dismiss [Docket No. 23], filed jointly by these
Defendants on June 5, 2008.  Because of Plaintiff's amended complaint and Defendant's
renewed motion, the previous Motion to Dismiss [Docket No. 23] is now moot and <u>DENIED</u> as
such.

[Docket No. 65], filed jointly by Defendants, The National Alert Registry, Inc. ("NAR") and Cyberspace to Paradise, Inc. ("Cyberspace"), on December 5, 2008; and the Motion for Expedited Hearing [Docket No. 70], filed by Watchdog on December 23, 2008.

In its Motion for Preliminary Injunction, Watchdog seeks to have the defendants enjoined from all allegedly infringing and similar injurious activities directed by them at Watchdog.  In their Motion to Dismiss, the Schweiss defendants contend that the Court lacks personal jurisdiction over them.  In their Motion to Dismiss, NAR and Cyberspace maintain that the Court lacks personal jurisdiction over them as well.  In its Motion for Expedited Hearing, Watchdog requests a hearing to address the issues before the Court. For the reasons detailed in this entry, Plaintiff's Motion for Preliminary Injunction is DENIED; Schweiss's Motion to Dismiss is GRANTED; NAR's Motion to Dismiss is GRANTED; and Plaintiff's Motion for Expedited Hearing is DENIED.

### *Factual Background*

Plaintiff, Watchdog, is an Indiana limited liability company with its principal place of business in Carmel, Indiana. Defendants, Lester and Sahra Schweiss, reside in Bridgeton, Missouri.[3]  Defendant, Innovates, Inc., is an administratively dissolved

---

[3]In an earlier briefing, Watchdog "consent[ed] to the dismissal of Sahra without prejudice due to . . . a lack of evidence at this time" but reserved the right to amend its complaint if it believed new evidence supported personal jurisdiction over her.  In its first amended complaint, Watchdog again named Sahra Schweiss as a defendant but has not presented any evidence regarding any actions she has taken, let alone any relating to Indiana.  The Schweiss Defendants so assert in their motion to dismiss; accordingly, their motion to dismiss is GRANTED as to

(continued...)

Wyoming corporation of which Lester Schweiss ("Schweiss") was President until its dissolution in 2004.  Defendant, NAR, is a corporation organized under the laws of Florida with its principal place of business in DeLand, Florida.  Defendant, Cyberspace, is also a Florida corporation, with its principal place of business located in the same offices as NAR, in DeLand, Florida.[4]

Watchdog offers to the public, at no cost, a national sex offender registry via its website, <familywatchdog.us>, which, we are told, is the most visited resource on the internet for information about registered sex offenders in the United States.  On October 17, 2006, Watchdog registered with the United States Patent and Trademark Office ("USPTO") the mark "FAMILY WATCHDOG."  Watchdog originally applied for this registration on November 9, 2005, and now owns the trademark under USPTO registration number 3,157,991.  Watchdog has used the FAMILY WATCHDOG mark as part of its business since June 7, 2005.

In January 2005, Innovates, Inc., although administratively dissolved at the time, registered a series of website domain names, including <familywatchdog.com> ("Schweiss's website"), <familywatchdog.org> and <familywatchdog.net> on the

---

[3](...continued)
Sahra Schweiss.

[4]The officers of NAR and Cyberspace are the same people, and Cyberspace owns the domain names <nationalalertregistry.com> and <registeredoffenderslist.org>, which NAR operates.

<GoDaddy.com> registrar.[5]  The latter two websites serve as "feeder sites" for the first.[6]

The following chart is an attempt to clarify the somewhat confusing names/identities of

the parties and their various websites:

| |
| --- |
| Plaintiff:    <u>Family Watchdog, LLC</u> (Indiana)<br>            &#9656;   familywatchdog.us<br>            &#9656;   "FAMILY WATCHDOG" (trademark)<br><br>Defendants:   <u>Schweiss</u> (Missouri)<br>            &#9656;   familywatchdog.com<br>            &#9656;   familywatchdog.org<br>            &#9656;   familywatchdog.net<br><br>              <u>Innovates, Inc.</u> (Wyoming)<br>            &#9656;   Administratively dissolved corporation formerly run by Schweiss<br><br>              <u>NAR and Cyberspace</u> (Florida)<br>            &#9656;   nationalalertregistry.com<br>            &#9656;   registeredoffenderslist.org |

In early October 2005, a local Indiana television news segment featured Watchdog

and discussed its website and sex offender registry.  Almost immediately, Schweiss

contacted Watchdog by email requesting that Watchdog contact him regarding the

purchase of the <familywatchdog.com>, <familywatchdog.org>, and

<familywatchdog.net> domain names, all of which Schweiss owned.  In all, Schweiss

---

[5]<GoDaddy.com> is an internet domain registrar and web hosting company.  On May 9, 2006, ownership of these three domain names was transferred from Innovates, Inc. to Lester Schweiss.  This appears to mark the final involvement of Innovates, Inc. in the present dispute.

[6]In other words, when a user attempts to access either the .org or the .net site, he is automatically directed to <familywatchdog.com>.

sent three emails to Watchdog: The first generally broached the topic of his offer of sale; the second acknowledged in detail Schweiss's awareness of Watchdog's website and informed Watchdog that traffic on Schweiss's site had substantially increased as a result of publicity surrounding Watchdog's site;[7] and the third specifically offered to sell the websites for $80,000.  Watchdog declined Schweiss's offer, but, approximately one month later, sent a counteroffer to which Schweiss never responded.[8]

About the same time, Watchdog embarked on a successful national publicity campaign.  On October 27, 2005, Watchdog was featured on *The Oprah Winfrey Show*, an appearance that generated over nine million hits on Plaintiff's <familywatchdog.us> website.  On March 2, 2006, Watchdog's president, Steve Roddel, was interviewed on *The O'Reilly Factor*, resulting in more than four million users visiting Watchdog's website during the ensuing seventy-two hours.  On May 22, 2006, Watchdog again was featured on television, this time on *The Dr. Phil Show*, which appearance generated more than fourteen million visits to the website.  Watchdog alleges that over time all the

---

[7]Specifically, Schweiss stated: "[M]y web site traffic has been skyrocketing because of publicity around your website . . . .  There are [thousands] of people who are finding my site mistakenly looking for yours."  Pl.'s Response [Docket No. 67] at 5.  The email also noted that an Indiana news station had incorrectly reported Watchdog's website as <familywatchdog.com> (Schweiss' site), rather than <familywatchdog.us>, a mistake that led many customers to the wrong website.

[8]Schweiss later renewed, and expanded, his offer.  During a conference call between Watchdog's Chief Financial Officer and Schweiss's counsel to discuss a pending World Intellectual Property Organization  action, Schweiss's counsel, unsolicited, offered to sell the <familywatchdog.com>, <familywatchdog.org>, and <familywatchdog.net> domain names to Watchdog for $200,000.

Defendants in this suit capitalized on the press and popularity Watchdog's publicity campaign had created by engaging in various intentional, wrongful acts directed at Watchdog that had the effect of infringing Watchdog's trademark.

Watchdog alleges that the mark "FAMILY WATCHDOG" was not used on any of Schweiss's sites in connection with a sex offender registry until, at the earliest, June 7, 2005.[9]  However, on March 3, 2006 (one day after the feature on *The O'Reilly Factor*), a prominent "banner" advertisement was added by Schweiss to the <familywatchdog.com> website.  When users clicked on this advertisement, it took them to <nationalalertregistry.com>, a website owned by Cyberspace and run by NAR, which is Watchdog's primary competitor.[10]  Watchdog alleges here that this clickable advertisement increased customer confusion.[11]

On May 23, 2006, one day after Watchdog's feature on *The Dr. Phil Show*, Schweiss placed a statement on the <familywatchdog.com> website as follows: "Due to mention on Dr. Phil, servers are overloaded."  Apparently in response to this action,

---

[9]Beginning in February 2005, Schweiss's website did use the mark, but only in conjunction with internet security issues, such as viruses.  Schweiss Reply at 2.

[10]NAR offers, for cost, sex offender registries through the websites <nationalalertregistry.com> and <registeredoffenderslist.org>, which are also available to any web user in the world.  Approximately one percent of NAR's total sales occurs in Indiana. As of November 1, 2008, 3,344 Indiana residents had subscriptions to NAR's website, out of a total of 276,394 subscriptions.

[11]Plaintiff also alleges customer confusion arising from the fact that a Google search for the term "familywatchdog" results in a paid link to <registeredofferslist.org/familywatchdog.htm>.  Pl.'s Response at 5.

Watchdog formally complained to <GoDaddy.com>, which provided access for all of Schweiss's websites, and on December 10, 2007, <GoDaddy.com> suspended all internet traffic to <familywatchdog.com>, <familywatchdog.org>, and <familywatchdog.net>.[12]

The most recent occurrences leading up to this litigation relate to trademark actions brought respectively by Schweiss and Watchdog.  On January 7, 2008, Schweiss filed a petition with the USPTO, seeking to cancel Watchdog's trademark registration.[13] Thereafter, on January 16, 2008, Schweiss filed an application with the USPTO to register a trademark for "FAMILYWATCHDOG.COM." On February 6, 2008, Watchdog initiated a proceeding before the World Intellectual Property Organization (WIPO), requesting that WIPO's Administrative Panel issue an order transferring the <familywatchdog.com>, <familywatchdog.org>, and <familywatchdog.net> domain

---

[12]On December 17, 2007, registration of the websites was transferred, presumably by Lester Schweiss, from <GoDaddy.com> to Key-Systems GMBH d/b/a domaindiscount24.com. Key-Systems is a corporation organized under the laws of Germany with a principal place of business in Germany. Watchdog notified Key-Systems that Schweiss was infringing Watchdog's trademark, but Key-Systems apparently has not taken any action with regard to the <familywatchdog.com> domain.

[13]Schweiss moved to suspend the trademark cancellation action pending resolution of the dispute in this Court.  Watchdog argues that Schweiss's motion to suspend in that proceeding forecloses any attempt at dismissal of this litigation because, in that motion, Schweiss stated to the USPTO that any decision of this Court should be dispositive of the trademark priority issue. Watchdog's argument is unavailing.  Schweiss's motion to suspend that proceeding stated, in effect, that *if* this Court made a trademark priority decision, then that decision should be dispositive.  Because Schweiss's request was conditional, and merely an attempt to prevent duplicative proceedings, he is not estopped from seeking dismissal here.  Moreover, the USPTO has not rendered a final judgment (and may yet do so), and Watchdog has not taken any action to challenge the suspension of that proceeding.

names to Watchdog.  The WIPO administrative panel denied Watchdog's claim.[14]

However, on April 28, 2008, Watchdog succeeded in persuading the USPTO to reject

Schweiss's proposed mark.[15]

The central dispute between these parties is captured in the litigation now pending

with this Court.  Currently before us are the Motions to Dismiss filed by the Schweiss

Defendants and NAR and Cyberspace as well as Watchdog's Motions for Preliminary

Injunction and (Request for) Expedited Hearing.

## *Legal Analysis*

### I. *Personal Jurisdiction Standard*

In a diversity action filed under 28 U.S.C. §1332, a federal district court has

personal jurisdiction over a non-resident defendant "only if a court of the state in which it

sits would have such jurisdiction."  Purdue Reseach Foundation v. Sanofi-Synthelabo,

S.A., 338 F.3d 773, 779 (7th Cir. 2003).  A district court may properly exercise personal

jurisdiction over a non-resident defendant if a two-step analysis is undertaken and

satisfied.  First, the party resisting the exercise of jurisdiction must be amenable to service

of process under the state's long-arm statute; second, the exercise of personal jurisdiction

---

[14]The ground for this denial was that the domain name dispute was ancillary to the trademark and unfair competition disputes, which the WIPO ruled would be better resolved by traditional means.

[15]The USPTO stated that Schweiss's mark was practically identical to Watchdog's registered mark and that confusion was likely to ensue from the registration of both marks.

must comport with the due process clause of the Constitution.  Id.  Indiana's long-arm statute, Indiana Rule of Trial Procedure 4.4(a), "expand[s] personal jurisdiction to the full extent permitted by the Due Process Clause." LinkAmerica Corp. v. Albert, 857 N.E.2d 961, 966 (Ind. 2006).  Thus, the sole question before us is whether due process would be offended were we to exercise personal jurisdiction over the Defendants.

For a court to acquire personal jurisdiction over a defendant, due process requires "that the defendant have such 'minimum contacts' with the forum state as will make the assertion of jurisdiction over him consistent with 'traditional notions of fair play and substantial justice[.]'" Lakeside Bridge & Steel Co. v. Mountain State Const. Co., 597 F.2d 596, 600 (7th Cir. 1979) (quoting International Shoe v. Washington, 326 U.S. 310, 316 (1945)).  In other words, defendants must have "fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (quoting Shaffer v. Heitner, 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment)).

Personal jurisdiction may be either specific or general.  A court may exercise specific jurisdiction over a defendant if the cause of action arises out of or relates to a defendant's purposefully established contacts with the forum state.  Helicopteros Nacionals de Columbia, S.A. v. Hall, 466 U.S. 408, 414 (1984); Burger King Corp., 471 U.S. at 472.  General jurisdiction, on the other hand, "is proper when a defendant has 'continuous and systematic business contacts' with a state, and it allows a defendant to be sued in that state regardless of the subject matter of the lawsuit." Premiere Credit of

North America, LLC v. AAT Fabrication, Inc., 2005 WL 1123636, at *2 (S.D. Ind. 2005),

citing Helicopteros, 466 U.S. at 416; see also Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 713

(7th Cir.2002); RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1277 (7th Cir.1997).


*A. Personal Jurisdiction and the Internet*

Because all public websites are available in all jurisdictions, the expansion of the

internet has presented new legal issues relating to personal jurisdiction. The law of

personal jurisdiction is not, however, replaced by a body of new law governing the

internet; rather, the familiar analytical principles are to be applied in internet cases.  See

Search Force, Inc. v. Dataforce International, Inc., 112 F. Supp. 2d 771 (S.D. Ind. 2000).

In a trademark infringement case in which internet contacts are at issue, a two-track

analysis must be undertaken: first, a court must determine whether jurisdiction is proper

under the "effects test" of personal jurisdiction; and, second, a court must analyze

whether the law permits personal jurisdiction over a defendant based solely on the

website(s) it operates.

Under the "effects test," specific jurisdiction may be established by a showing of:

(1) purposeful availment by the defendant of the benefits and protections of the laws of

the forum; and (2) harm to an individual within the state where the harm is both

intentional and aimed at the forum state.  Hy Cite Corp. v. Badbusinessbureau.com, LLC,

297 F.Supp.2d 1154, at 1163 (W.D. Wis. 2004); see also Asahi Metal Indus. Co. V.

Superior Court of California, 480 U.S. 102, 109 (1984); Calder v. Jones, 465 U.S. 783

(1984).

In a trademark case, courts are to be wary of conflating a knowing infringement with intentional harm aimed at the forum. Nerds on Call, Inc. (INDIANA) v. Nerds on Call, Inc. (California), 2008 WL 5384504 at *2 (S.D. Ind. 2008).[16] Jurisdiction over a defendant *may* be proper when the injury to the trademark occurred in Indiana, but the existence of other contacts with the forum must be established. See Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Piship, 34 F.3d 410, 412 (7th Cir. 1994) (holding that because, in addition to the infringement, defendant planned to target Indiana customers by broadcasting its games in Indiana, where "the largest concentration of consumers" was, jurisdiction was proper); Wallace v. Herron, 778 F.2d 391 (7th Cir. 1985) ("We do not believe that the Supreme Court, in *Calder,* was saying that any plaintiff may hale any defendant into court in the plaintiff's home state, where the defendant has no contacts, merely by asserting that the defendant has committed an intentional tort against the plaintiff."). Thus, although the infringement evinces harm, some "intentional targeting" of an individual in the forum, whether related to the trademark or to customer confusion, is required for personal jurisdiction under the "effects test."[17] Nerds, 2008 WL 5384504 at *2 (S.D. Ind. 2008).

---

[16]"[T]he broad proposition that a victim of . . . alleged trademark infringement . . . can sue in it[s] home jurisdiction simply because the injury was felt there is not accepted even in the Seventh Circuit." Nerds, 2008 WL 5384504 at *5.

[17] In Nerds, Nerds/Indiana could not show that Nerds/California had intentionally targeted any Indiana customers. Thus, personal jurisdiction over the California entity in an

(continued...)

The second analytical track inquires whether the defendant's website itself forms a basis for jurisdiction.  In assessing website-based jurisdiction, some courts have noted the "sliding scale" analysis established in Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119 (W.D. Pa. 1997).  See, e.g., Nerds, 2008 WL 5384504  at *5.  Under Zippo, passive sites permit no jurisdiction; interactive sites do permit jurisdiction; and hybrid sites are dealt with on a case-by-case basis.  A passive site is a "one-way conduit for information"; a hybrid site allows users to submit information to the site; and an interactive site allows users to contract business directly through the site. Nerds, 2008 WL 5384504  at *9.

The Seventh Circuit has not decided whether the Zippo rule, or some other such approach, best addresses internet jurisdiction issues, but it has observed that "interactivity" is an important factor in the determination of whether a site provides for jurisdiction.  Jennings v. AC Hydraulic A/S, 383 F.3d 546, 550 (7th Cir. 2004). Moreover, as at least two courts in this circuit have recognized, the Zippo framework is not the beginning and end of internet personal jurisdiction analysis.  That analysis must necessarily incorporate traditional personal jurisdiction principles as well.  See Hy Cite, 297 F.Supp.2d 1160;  Richter v. INSTAR Enterprises Intern. Inc., 2009 WL 174981 at *8 (N.D. Ill. 2009); see also Winfield Collection, Ltd. v. McCauley, 105 F.Supp.2d 746, 750

---

[17](...continued)
Indiana court was improper. The distinction between Nerds and Indianapolis Colts was this: In Indianapolis Colts, the defendant intentionally targeted the Indiana customer base by broadcasting there - it was the largest potential customer base.  In Nerds, by contrast, there was no special basis for Nerds/California to have targeted Indiana customers.

(E.D. Mich. 2000) ("It seems to this court that the ultimate question can still as readily be answered by determining whether the defendant did, or did not, have sufficient 'minimum contacts' in the forum state.").

Fifty years ago, the Supreme Court, in <u>Hanson v. Deckla</u>, 357 U.S. 235 (1958), directed federal courts to be sensitive to changes in technology, warning that technological advances must not be allowed to lead to "the eventual demise of all restrictions on the personal jurisdiction of state courts." <u>Hanson</u>, 357 U.S. at 251. This guidance along with other general governing principles, such as the need for minimum contacts and purposeful availment, underscore the perils of applying the <u>Zippo</u> framework too broadly. <u>Hy Cite</u>, 297 F.Supp.2d 1160. As <u>Hy Cite</u> observed, "[A] rigid adherence to the <u>Zippo</u> test is likely to lead to erroneous results." <u>Id.</u>; <u>see also</u> <u>Richter</u>, 2009 WL 174981 at *8.

"Interactivity," as the Seventh Circuit noted in <u>Jennings</u>, is an important metric in website-based personal jurisdiction analysis, but it is not by itself controlling. There is no simple analog to interactivity in traditional minimum contacts analysis, and "it is not clear why a website's level of interactivity should be determinative on the issue of personal jurisdiction." <u>Id.</u> Under traditional due process principles (and contrary to the specialized rule of <u>Zippo</u>), "an 'interactive' or commercial website may not be sufficient to support jurisdiction if it is not aimed at residents in the forum state." <u>Id.</u> (citing <u>CTE New Media Services, Inc. v. Bell-South Corp.</u>, 199 F.3d 1343, 1349-50 (D.C. Cir. 2000)). In other words, "regardless of how interactive a website is, it cannot form the basis for

13

personal jurisdiction unless a nexus exists between the website and the cause of action or unless the contacts through the website are so substantial that they may be considered 'systematic and continuous' . . . ." Id.; see also Winfield Collection, 105 F.Supp.2d at 750.

Thus, in the analysis that follows, while mindful of "interactivity" and the template created in Zippo, following the teachings in Jennings, we shall regard a website's level of "interactivity" as but one factor in the personal jurisdiction determination, while relying primarily on the traditional personal jurisdiction factors of purposeful availment, minimum contacts with the forum, and fair play.

## II. Personal Jurisdiction over Schweiss

Watchdog's arguments in support of the exercise of personal jurisdiction over Schweiss include the traditional specific jurisdiction arguments as well as both the "effects test" and website-based jurisdiction analysis.[18]  First, according to Watchdog, Schweiss's three emails sent to Watchdog offering to sell the domain names Schweiss owned, followed by a similar offer made through counsel during a telephone conference, opened Schweiss up to an exercise of personal jurisdiction over him and his related

_____

[18]We note that Watchdog has also named Key-Systems as a defendant in this lawsuit. Key-systems has not filed a motion to dismiss, but it appears that this Court cannot maintain personal jurisdiction over Key-Systems.  Watchdog has pointed to no contacts whatsoever between Key-Systems and this forum, whether related or unrelated to the cause of action.  We shall withhold a specific ruling to that effect, however, until the parties choose to raise it expressly.

business entities in Indiana.  Clearly, however, these communications, isolated and

preliminary as they are, are not sufficient to satisfy the test for general jurisdiction, being

neither continuous nor systematic.  Nor are they sufficient under the traditional rule for

specific personal jurisdiction.  As Schweiss has been quick to point out, to authorize an

exercise of specific personal jurisdiction, the cause of action must arise out of or closely

relate to the purposefully established contacts Schweiss made with Indiana.  See

Helicopteros, 466 U.S. at 414.  In the present case, Watchdog's cause of action is one for

trademark infringement, which neither arises out of nor substantially relates to the emails

Schweiss sent to Watchdog.  Thus, jurisdiction cannot properly be grounded solely on the

offers of sale which Schweiss made.[19]

Watchdog's second jurisdictional argument is based on the "effects test."  To

satisfy the "effects test," Watchdog must show (1) purposeful availment by the defendant,

and (2) intentional harm aimed at the forum state.  Hy Cite, 297 F.Supp.2d at 1163; see

also Asahi Metal Indus. Co. V. Superior Court of California, 480 U.S. 102, 109 (1984);

Indianapolis Colts, Inc.,  34 F.3d at 412.  Watchdog must thus show more than

infringement harm to satisfy this test.

As with the plaintiff in Nerds, Watchdog argues that customer confusion evinces

the "intentional targeting" necessary to satisfy the "effects test."  In Nerds, the plaintiff

---

[19]Clearly, the emails relate to this cause of action to some extent in that they reflect
Schweiss's awareness of the confusion being created by the similarly named websites.  However,
because those emails relate primarily to an offer of sale, and not to the infringement claim, they
do not suffice to bootstrap Watchdog's jurisdictional assertions.

argued that at least some of its customers in Indiana would have been confused by the existence of another company with the "NERDS ON CALL" mark, but the plaintiff failed to muster any evidence of specific customer confusion.  Without such evidence, Judge Hamilton found plaintiff's contention of "customer confusion in Indiana" to be lacking as a basis for jurisdiction.[20]

In the case at bar, Watchdog cites two actual customers who claim to have been confused by the alleged trademark infringement.  Although this evidence distinguishes the present case from <u>Nerds</u>, it is not enough to satisfy the "targeting" part of the "effects test" because Watchdog has been unable to show that Schweiss intentionally targeted anyone in Indiana.  The news error cited as evidence of confusion occurred in October 2005, a time when Schweiss apparently did not even know of the existence of Watchdog's website or services.  Thus, whatever confusion resulted from the news story, it was not caused by any purposeful action that Schweiss directed at or to Indiana.  As a general matter, the record suggests that Schweiss has never done anything to attract Indiana customers to his website.  As we have noted previously, mere customer confusion is not enough; to rise to the level of "targeting," the customer confusion in a particular

---

[20]"The solution to that problem is not to require that all trademarks be given worldwide effect even if their non-web use is limited to a narrow geographic area.  Instead, users of the web simply need to understand that a worldwide web search may turn up results from distant businesses."  <u>Nerds</u>, 2008 WL 5384504 at *7.  Otherwise, any "trademark defendant who operates a website [would be subject] to personal jurisdiction in any jurisdiction."  <u>Id.</u>

forum must somehow bear the defendant's fingerprints.[21]  In <u>Indianapolis Colts, Inc.</u>, the defendant attempted to target potentially susceptible customers by broadcasting specifically in Indiana.  34 F.3d at 412.  Watchdog simply has not shown this same sort of affirmative, intentional targeting by Schweiss in the context of customer confusion.  Therefore, Watchdog's customer confusion "effects test" theory is unavailing.

Finally, Watchdog argues that, by placing the banner advertisement on his website, Schweiss did, indeed, target Watchdog.  Schweiss does not dispute that, when he agreed to place NAR's banner advertisement on the <familywatchdog.com> website, he was aware of Watchdog and its services.  Rather, Schweiss only disputes the notion that he targeted Watchdog in Indiana by this action, arguing that "it is difficult to fathom how merely placing a link to the website of a third-party business that is not even located in Indiana can be characterized as 'doing business' in Indiana."  Schweiss' Reply at 7.

Watchdog maintains that Schweiss is subject to personal jurisdiction in this forum based on his having received a $65,000 payment to run the advertisement on his website.  <u>Rainy Day Books, Inc. v. Rainy Day Book & Café, LLC</u>, 186 F.Supp.2d 1158 (D. Kan. 2002) ("Even though the ordering process is accomplished through . . . a third-party book ordering service, Defendant receives economic benefits from the book sales made through the [third-party] link.").  In our view, however, the mere receipt of this $65,000 fee is

---

[21]Schweiss's actions may very well have created customer confusion, but such confusion would have confused customers in any state.  Furthermore, it cannot be said that his use of similarly named websites allowed him to intentionally create confusion because he operated and managed his websites well before Watchdog obtained its trademark registration, and thus long before any confusion arose.

insufficient to establish personal jurisdiction because it is distinguishable from the economic benefit that justified personal jurisdiction in <u>Rainy Day Books</u>, where the defendant benefitted from each sale made in the forum state.  <u>See id.</u> at 1164.  Schweiss received a flat fee, which bore no relation to any specific sales made on the website.  The advertisement did not create any specific connection to Indiana and does not suffice to establish a basis for personal jurisdiction.  <u>Tamburo v. Dworkin</u>, 2007 WL 30462616 at * 6 (stating that "merely linking" to a website that is interactive is not sufficient for personal jurisdiction on its own).  In summary, Watchdog has failed to demonstrate any targeting of Indiana by Schweiss, which defeats any assertion of personal jurisdiction over Schweiss based on an "effects test" theory.

Determining whether personal jurisdiction may be exercised over Schweiss based solely on his website is a rather simple and straightforward matter.  Applying the rigid <u>Zippo</u> rule, the website would simply be regarded as passive, and jurisdiction would thus not arise.  <u>See Zippo</u>, 952 F.Supp. at 1124. Under the more nuanced <u>Hy Cite</u> rule, the site would not support an exercise of personal jurisdiction for two reasons: (1) it is a passive website; and (2) there are no other contacts with the forum to permit an exercise of personal jurisdiction consistent with traditional notions of fair play.  <u>Hy Cite</u>, 297 F.Supp.2d at 1161; <u>Lakeside Bridge & Steel</u>, 597 F.2d at 600.  Thus, neither Schweiss's website, nor his three emails to Watchdog offering to sell the web domains, nor the alleged trademark infringement, provide a sufficient basis for personal jurisdiction.

### III.  *Personal Jurisdiction over NAR and Cyberspace*

The question of whether personal jurisdiction may properly be maintained over NAR and Cyberspace also must be resolved based on the "effects test" and the website-based jurisdiction analysis.  Although these companies are separate entities, they share a relationship: NAR operates the subject websites owned by Cyberspace.  Their only contacts with Indiana relate to the operation of those sites.  Thus, we address the personal jurisdiction as to each in a combined fashion.

Under the "effects test," we note once more, minimum contacts for an exercise of specific jurisdiction may be established only with a showing of (1) purposeful availment by the defendant, and (2) intentional harm aimed at the forum state.  Indianapolis Colts, Inc., 34 F.3d at 412; Wallace, 778 F.2d 391.  Watchdog's "effects test" theory applicable to these defendants is that they knowingly capitalized on Indiana customer confusion, thereby targeting Watchdog in Indiana.[22]  According to Watchdog, evidence of customer confusion is drawn from the fact that 3,344 Indiana residents purchased the services offered on <nationalalertregistry.com>.  Although 3,344 may seem at first blush like a lot, in fact it represents only one percent of NAR's total sales (276,394).  Thus, this fact does not establish that NAR targeted Indiana customers more than customers in any other state.

---

[22]Watchdog's allegation of wrongdoing by NAR and Cyberspace arises out of the "clickable" banner advertisement on Schweiss's website.  When an internet user clicks on this advertisement, he is directed to <nationalalterregistry.com>.  Watchdog alleges that NAR and Cyberspace knew of the infringing nature of Schweiss's website and that they sought to take advantage of customer confusion stemming from that infringement, thereby contributing to the infringement alleged in this case.

19

Watchdog proffers an additional set of facts that it suggests evince direct targeting of Indiana by these Defendants.  According to Watchdog, NAR and Cyberspace purchased search words on search engines like Google and Yahoo.  A Google search of the term "family watch dog," for example, triggers a paid link to the web page <registeredoffenderslist.org/familywatchdog.htm>.[23]

In determining issues relating to personal jurisdiction, we must analyze and decide whether the purchase of the words, "family watch dog," by the Defendants constitutes "direct targeting" or a "purposeful availment" of the Indiana forum.  Our review leaves us unconvinced that it does.  Assuming that NAR was, in fact, seeking to associate itself with Schweiss's website, which also bears the name "Family Watchdog," where it had purchased its prominent banner, nothing establishes that the purchase of these search terms constituted targeting that was "aimed at" Indiana.

Watchdog proffers no other evidence that NAR targeted Watchdog or took any other action directly aimed at Indiana. Certainly, it is reasonable to assume that NAR sought to compete with Watchdog, but the mere placement of an advertisement link that is available everywhere on another company's potentially infringing website is too attenuated a connection either to Watchdog or to Indiana to permit the Court's proper

---

[23]Watchdog also points out that the second most frequent search term that leads internet users to <nationalalertregistry.com> is "Indiana sex offender," but Watchdog has presented no evidence that either of the Defendants purchased those terms or did anything intentional to associate their websites with those terms.  Thus, we cannot regard this as evidence of any intentional action by Watchdog.

exercise of personal jurisdiction.  Defendants NAR and Cyberspace's motion to dismiss for lack of personal jurisdiction must therefore be granted.

*A. The Websites as a Basis for Jurisdiction*

Watchdog's argument here amounts to little more than a citation to Zippo.  As discussed above, however, the holding in Zippo does not provide reliable guidance for an internet-based personal jurisdiction analysis.  Instead, courts are directed to couch their analyses in the tried and true general principles of personal jurisdiction law.

Although a website's "interactivity" is a relevant factor to consider, purposeful availment and fairness remain paramount in resolving personal jurisdiction issues. Richter v. INSTAR, 2009 WL 174981 at *8. As the court in Hy Cite noted, "[A] finding that a defendant uses its website to engage in repeated commercial transactions may support the exercise of personal jurisdiction, so long as there is a corresponding finding that the defendant is expressly targeting residents of the forum state and not just making itself accessible to everyone regardless of location."  Hy Cite, 297 F.Supp.2d at 1161; see also Bancroft & Masters, Inc. v. Augusta National, Inc., 223 F.3d 1082, 1087 (9th Cir. 2000) (holding that interactivity is insufficient by itself and that there must be "express aiming" at the forum state); B.E.E. International Ltd. v. Hawes, 267 F.Supp.2d 477 (M.D.N.C. 2003).

Thus, for personal jurisdiction over them to exist, in addition to operating an interactive website, Defendants must also have sufficient minimum contacts with the

forum related to the cause of action.  NAR operates, and Cyberspace owns, a website that probably is most accurately classified as interactive because it allows for direct online sales.[24]  Beyond this, however, there must be some evidence that NAR and Cyberspace are or were "expressly targeting" residents of Indiana, or NAR and Cyberspace must have sufficient minimum contacts with Indiana related to this cause of action.  Hy Cite, 297 F.Supp.2d at 1161.  Watchdog has failed to make either such showing.

As was true with Schweiss, Watchdog's evidence of customer confusion is not enough to constitute a proper basis for personal jurisdiction.  Although Watchdog has shown that at least one customer utilized NAR's site based on some level of confusion, there is no showing that the confusion was other than incidental to some action taken by NAR.  In fact, the confusion resulted from an erroneous television news story that ran months before NAR placed its advertisement on Schweiss's site.  Thus, put simply, there is no evidence that NAR and Cyberspace ever targeted Indiana customers.

Watchdog's action in this case is for trademark infringement, and the sales made on NAR's website do not relate to that claim.  Their only connection to Watchdog arises from the fact that the two companies are competitors of one another.  Lacking any evidence that NAR or Cyberspace targeted any individual(s) or customer(s) in Indiana, and because the contacts, such as they are, between NAR and Indiana bear no substantial

---

[24]  This interactivity has resulted in over three thousand contacts and sales with Indiana residents. As we discuss below, the quantity of sales themselves is insufficient to provide a proper basis for jurisdiction.

relationship to this cause of action, we conclude that an exercise of specific personal jurisdiction over these two companies would be improper.[25]

*B.  General Jurisdiction*

In contrast to Schweiss, whom we have determined not to be subject to general jurisdiction in Indiana, NAR and Cyberspace have conducted thousands of sales in Indiana.  Thus, we must decide whether an exercise of general jurisdiction is appropriate as to them. As Seventh Circuit precedent makes clear, a defendant's contacts with the forum "must be so extensive to be tantamount [to] . . . being constructively present in the state to such a degree that it would be fundamentally fair to require it to answer in an Indiana court in *any* litigation arising out of *any* transaction or occurrence taking place *anywhere* in the world."  Purdue Research Foundation, 338 F.3d at 787.  Watchdog advances no general jurisdiction argument, however, and thus has likely waived it.  Assuming no waiver, we shall, *sua sponte*, extend our discussion to include this issue, out of an abundance of adjudicatory caution.  With regard to whether general jurisdiction can be asserted by Watchdog over NAR and Cyberspace, two possible grounds arguably exist: the website itself and the numerous sales NAR and Cyberspace made in Indiana.

---

[25]We note also that, even under Zippo, this site is likely insufficient to support an exercise of personal jurisdiction.  See Tate & Lyle Sucralose, Inc. v. Hebei Sukeri Science and Technology Co.,  2006 WL 3391421 at *2 (C.D. Ill. 2006) (holding that $19,000 in product sales in Illinois unrelated to the infringement claim and a website permitting Illinois customers to place orders via the internet does not establish the minimum contacts necessary for personal jurisdiction).

The fact that NAR and Cyberspace operate an interactive website is, by itself, insufficient, as we have previously noted now several times.  See Molnlycke Health Care AB v. Dumex Med. Surgical Products, Ltd., 64 F. Supp.2d 448, 451 (E.D.Pa 1999) ("[T]he establishment of a website through which customers can order products does not, on its own, suffice to establish general jurisdiction.  To hold that the possibility of ordering products from a website establishes general jurisdiction would effectively hold that any corporation with such a website is subject to general jurisdiction in every state.").

The only other contacts NAR and Cyberspace have had with Indiana arise out of their sales made here, which amount to approximately one percent of NAR's total sales.  Some cases have held that such a small percentage of sales may suffice for jurisdictional purposes.  See Eli Lilly and Co. v. Mayne Pharma (USA) Inc., 504 F.Supp.2d 387 (S.D. Ind. 2007) (holding that millions of dollars in sales, although still a small percentage of total sales, may form a basis for general personal jurisdiction, when in conjunction with visits into and faxes sent to the forum); see also 3M Innovative Properties Co., 2005 WL 361494 (holding exercise of jurisdiction proper when defendant generated $3.8 million in revenue from sales in the forum state - only .64% of its total sales - because its employees also made 21 visits to the state in one year in order to make sales).  In the case at bar, however, there is no evidence of any representative of NAR or Cyberspace ever making any sales visits to Indiana, or initiating any other kinds of sales contacts in Indiana.  This militates against an exercise of general jurisdiction.  See L.H. Carbide Corp. v. Piece Maker Co., 852 F. Supp. 1425 (N.D. Ind. 1994) (declining to exercise personal

24

jurisdiction where the defendant made eight percent of its total sales in the forum state);

see also Rieke Corp. v. American Flange & Mfg. Co. Inc., 2007 WL 1724897 (N.D. Ind.

2007) (holding that indirect contacts and marketing efforts directed toward Indiana and

sales of less than one million dollars was not sufficient for the exercise of jurisdiction);

see also Nichols v. G.D. Searle & Co., 991 F.2d 1195 (4th Cir. 1993) (holding that

general jurisdiction did not exist where the defendant employed between nineteen and

twenty-three representatives in the forum and made nine to thirteen million dollars in

sales - two percent of total sales - in the forum over five years).

 Because NAR and Cyberspace's sales figures are relatively insubstantial, because

none of its agents traveled to Indiana for business purposes or otherwise specifically

targeted customers in this State, and because there is no other evidence indicating that

they significantly availed themselves of the benefits and protections of Indiana law, an

exercise of general jurisdiction over them would be clearly improper.  A company must

have a substantial enough connection to the forum to put it on notice of the fact that it

might be sued in that state, so that it "can act to alleviate the risk of burdensome litigation

by procuring insurance, passing the expected costs onto customers, or, if the risks are too

great, severing its connection with the State."  World-Wide Volkswagen Corp. v.

Woodson, 444 U.S. 286, at 297 (1980).  Such is not the case here.

 We conclude that the totality of NAR's (and Cyberspace's) contacts do not suffice

to establish the minimum contacts necessary for personal jurisdiction.  Despite the

obvious interactivity of NAR's website, the companies' contacts with Indiana are

insufficient and are not substantially related to this cause of action.  Neither general nor

specific jurisdiction has been established.

### IV.  Motion for Preliminary Injunction

Having granted Defendants' Motions to Dismiss on jurisdictional grounds,

Watchdog's Motion for Preliminary Injunction is moot and must therefore be denied.

### V.  Expedited Hearing

Having resolved all issues fully before the Court without necessity of a hearing,

Watchdog's Motion for Expedited Hearing is moot, and shall be denied as such.

### VI.  Transfer

We shall not order a transfer of this cause to another jurisdiction, lacking any clear

indication of where Plaintiff prefers to have it be refiled.  We do note, however,

consistent with the Seventh Circuit's decision in Jennings v. AC Hydraulic A/S, that

under Indiana law a plaintiff may refile in another jurisdiction, if the case is dismissed in

Indiana on personal jurisdiction grounds.  See Jennings, 383 F.3d at 552; Cox v. Amer.

Aggregates Corp., 684 N.E.2d 193, 195 (Ind. 1997).

## VII.  Conclusion

Having carefully considered the parties' arguments, we hold that personal jurisdiction over Schweiss, Innovates, Inc., NAR, Cyberspace, and Key-Systems has not been established by Watchdog.  Accordingly, Watchdog's Motion for Preliminary Injunction is <u>DENIED</u> as moot; Schweiss' Motion to Dismiss is <u>GRANTED</u>; NAR's and Cyberspace's Motion to Dismiss is <u>GRANTED</u>; and Watchdog's Motion for Expedited Hearing is <u>DENIED</u>.

IT IS SO ORDERED.

Date:  _____02/05/2009_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

James Jeffrey Deery
WINDERWEEDLE HAINES WARD & WOODMAN, P.A.
jdeery@whww.com

Andrew Thomas Dixon
WINDERWEEDLE HAINES WARD & WOODMAN, P.A.
adixon@whww.com

Annette P. Heller
HELLER & ASSOCIATES
tmattorneyheller@aol.com

Constance Regina Lindman
CONSTANCE R. LINDMAN, P.C.
constance@lindmanlaw.com

Andrielle Marie Metzel
DANN PECAR NEWMAN & KLEIMAN
ametzel@dannpecar.com

Paul B. Overhauser
OVERHAUSER LAW OFFICES
poverhauser@overhauser.com

Morris E. Turek
HELLER & ASSOCIATES
tmattorneyturek@aol.com